**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF PENNSYLVANIA, URBAN LEAGUE OF GREATER PITTSBURGH, AMY CAMPBELL, and WILLIAM GILLIGAN,<br><br>Plaintiffs,<br><br>v.<br><br>KATHY BOOCKVAR, in her Official Capacity as Secretary of the Commonwealth of Pennsylvania, JESSICA MATHIS, in her Official Capacity as the Director of the Bureau of Election Services and Notaries, ALLEGHENY COUNTY BOARD OF ELECTIONS, BUCKS COUNTY BOARD OF ELECTIONS, PHILADELPHIA COUNTY BOARD OF ELECTIONS, RICH FITZGERALD, in his official capacity as member of the Allegheny County Board of Elections, SAMUEL DeMARCO III, in his official capacity as member of the Allegheny County Board of Elections, BETHANY HALLAM, in her official capacity as member of the Allegheny County Board of Elections, DIANE M. ELLIS-MARSEGLIA, in her official capacity as member of the Bucks County Board of Elections, GENE DiGIROLAMO, in his official capacity as member of the Bucks County Board of Elections, BRIAN T. McGUFFIN, in his official capacity as member of the Bucks County Board of Elections, AL SCHMIDT, in his official capacity as member of the Philadelphia County Board of Elections, LISA M. DEELEY, in her official capacity as member of the Philadelphia County Board of Elections, OMAR SABIR, in his official capacity as member of the Philadelphia County Board of Elections.<br><br>Defendants. | Civil Action No. _____<br><br><br><br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Mail-in voting is a critical tool to ensure that voters can participate in democracy while guarding their health and the health of the community during the COVID-19 pandemic—a crisis that shows no sign of abating as the November general election approaches. In the June 2016 presidential primary, 87,000 Pennsylvania voters cast an absentee ballot. Four years later, during the June 2020 presidential primary, nearly 1.5 million Pennsylvania voters cast either an absentee or mail-in ballot. In 2019, the General Assembly enacted Act 77, which among other things made mail-in voting universally available, making democracy more accessible in Pennsylvania. However, the administration of Pennsylvania's vote-by-mail system retains a critical flaw that now is likely to affect many more Pennsylvania voters: lack of a mandatory notice and cure process for missing signatures or perceived mismatches between an application's and a ballot's signature. The lack of any guidance from the Secretary of the Commonwealth has led to variation among Pennsylvania counties as to whether, and how, voters are provided notice and an opportunity to cure problems related to ballot signatures. Voters have a due process right to such notice and opportunity to cure, and an equal protection right to a uniform statewide procedure for counting mail-in ballots[1] that is applied regardless of the county in which the voter resides and casts their ballot.

2.      The June 2020 primary election illustrates the problem. According to news reports, over 26,500 mail-in ballots were rejected in the June 2020 Pennsylvania primary. Among those were voters' whose ballots were rejected for signature-related errors or matters of penmanship. Without judicial intervention, this pattern of disenfranchisement will continue in every election.

---

[1] Unless otherwise specified, Plaintiffs use "mail-in ballot" as a general term to encompass both mail-in and absentee voting.

3.      Pennsylvania's failure to adopt and maintain a uniform statewide procedure of notice and an opportunity to cure signature-related errors before rejecting mailed-in ballots is unconstitutional under any circumstance, depriving mail-in voters of their fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution, their right to due process of law in violation of the Fourteenth Amendment, and their right to equal protection under law.

4.      This year, amidst the COVID-19 pandemic and Pennsylvania's first-time implementation of the vote-by-mail provisions of Act 77, the issue takes on greater urgency because of Pennsylvania's already demonstrated—and dramatic—shift towards voting by mail. While historically fewer than five percent of Pennsylvania voters voted by mail, in the recent primary that number was 50%, or nearly 1.5 million voters. The November 3, 2020 general elections will likely see a similar increase in vote by mail compared to past years. Mail-in voters deserve the same confidence that their vote will be counted as if they voted at their local polling site on Election Day. But the absence of uniform, statewide procedures for notice and cure of signature-related ballot issues precludes that confidence. If not remedied, thousands, or even tens of thousands, of eligible Pennsylvania voters will have their votes uncounted in the November general election.

## PARTIES

5.      Plaintiff League of Women Voters of Pennsylvania ("LWVPA") is a nonpartisan, nonprofit organization under Section 501(c)(3) of the Internal Revenue Code and is an affiliate of the League of Women Voters of the United States, which has over 700 state and local Leagues across all 50 states, the District of Columbia, Puerto Rico, Virgin Islands, and Hong Kong. LWVPA encourages informed and active participation in government, works to increase

understanding of major public policy issues, and influences public policy through education and advocacy. LWVPA advocates for expansion of voting opportunities, including through vote-by-mail, and provides information directly to members who wish to vote by mail, including by providing links on its website where members can find information about voting by mail, download an application to vote by mail, and view a guide to completing the application.

6.      LWVPA has approximately 2,183 members throughout Pennsylvania, who belong to 29 chapters located across the Commonwealth. These members, like all Americans, have all had their daily lives altered by COVID-19. As a result, a substantial number of them intend to vote by mail in Pennsylvania's upcoming elections. LWVPA will be required to divert resources away from its core activities in order to ensure mail-in ballots cast by their members and the voters they serve are not arbitrarily rejected absent the implementation of a statewide notice and cure procedure. LWVPA has members whose signatures may not be visually consistent over time, including elderly voters and voters with disabilities, who are at a heightened risk of being denied the right to vote because of perceived signature issues, including signature mismatch. Members have likely been denied the right to vote due to signature issues in previous elections and are statistically likely to be denied the right to vote due to signature issues in upcoming elections.

7.      Plaintiff Urban League of Greater Pittsburgh ("Pittsburgh Urban League") is a Pittsburgh, Pennsylvania-based non-profit civil rights organization that works to ensure economic self-reliance, parity and power, and civil rights for African Americans. Founded in 1918, the Pittsburgh Urban League is the largest comprehensive social service and civil rights organization in Southwestern Pennsylvania and has over 200 members in the greater Pittsburgh area. Through vital programs in employment, youth, family and child development, housing and self-sufficiency, the Pittsburgh Urban League works to level the playing field for all Americans and to equip

4

disadvantaged families to care for themselves. Through the National Urban League's "Reclaim the Vote" project, the Pittsburgh Urban League works to educate its members and African Americans in Southwestern Pennsylvania on their rights, register them to vote, and encourage them to vote.

8.      In the upcoming elections, and in light of the challenges and health risks posed by in-person voting during the ongoing public health crisis, the Pittsburgh Urban League expects that many of its members and engaged community will choose to vote by mail. It intends to engage its members and the Southwestern Pennsylvania African American community more broadly on issues related to mail-in voting, including related deadlines and requirements. The Pittsburgh Urban League anticipates that given the procedural deficiencies in Pennsylvania's system for reviewing and rejecting mail-in ballots, at least some of its members who vote by mail will have their votes not counted as a result of a signature-related deficiency

9.      Plaintiff Amy Campbell is a 26-year-old citizen of the Commonwealth of Pennsylvania. Ms. Campbell resides and is registered to vote in Philadelphia County. In past elections, Ms. Campbell has voted in person; however, for the June 2020 primary election, she elected to vote by mail. Ms. Campbell submitted an online application for a mail ballot in April 2020 and received her mail ballot on or around May 14, 2020. She completed and mailed her ballot to the County Board of Elections on approximately May 19, 2020.

10.     Because of her concerns about the backlog of mail-in ballots and delays in the postal service, Ms. Campbell repeatedly checked the status of her mail-in ballot on the Department of State's website; the status of her ballot remained "pending" through Election Day on June 2, 2020, and the extended receipt date for mail-in ballots on June 9, 2020.

11.     On June 11, 2020—two days after the receipt deadline—Ms. Campbell received an email from the Philadelphia County Board of Elections confirming receipt of her mail-in ballot

and notifying her that her ballot had been rejected because the Board "could not obtain [her] required signature." The email contained no information regarding whether or how Ms. Campbell could cure her ballot and have it counted, and by that time it was too late to vote in person. Her vote simply did not count. Ms. Campbell is concerned that any future mail-in ballots she submits may similarly not be counted on the basis of signature deficiencies.

12.     Plaintiff William Gilligan is an 83-year-old citizen of the Commonwealth of Pennsylvania. Mr. Gilligan is a veteran of the Marine Corps. He moved to Bucks County, Pennsylvania from California in February 2019 to live closer to his immediate family in a senior care facility. Since approximately 2013, Mr. Gilligan has suffered two major strokes, leaving his body very weakened. He uses a wheelchair at all times and has impaired control over his handwriting. While he is still able to sign (and wishes to sign) his own ballot, he does not believe he could reliably sign his name in the same way each time he does so.

13.     Mr. Gilligan submitted his voter registration form in May 2020. He does not yet appear on the online voter registration database. When his daughter called the Bucks County Board of Elections on or around July 20, 2020, the official notified her that the county is backlogged in processing voter registration forms in light of the recent primary and that he should expect to have his voter registration processed by early August. Mr. Gilligan intends to vote in the November 2020 general elections and future elections thereafter.

14.     Mr. Gilligan was largely confined to his senior care facility even before COVID-19. Given his many medical conditions, he is at very high risk for COVID-19. He cannot vote in person. Mr. Gilligan is very concerned that his ballot will be rejected due to a potential signature mismatch. If Mr. Gilligan received notice of any perceived mismatch, he could and would confirm his signature and have his ballot counted.

15.    Defendant Kathy Boockvar is the Secretary of the Commonwealth of Pennsylvania. Secretary Boockvar is the Chief Election Official of Pennsylvania and a member of the Governor's Executive Board, and she is charged with the general supervision and administration of Pennsylvania's election and election laws, including: tabulating, computing, and canvassing all votes, including those cast by mail; certifying and filing the tabulation of votes; and ordering county boards to conduct recounts and recanvasses. *See* 25 Pa. Stat. §§ 2621; 3159. Secretary Boockvar's responsibilities also include supervising the county boards of elections. 25 Pa. Stat. § 2621. She is sued in her official capacity only.

16.    Defendant Jessica Mathis is the Director of the Bureau of Election Services and Notaries ("BESN" or the "Bureau"). The Bureau is responsible for planning, developing, and coordinating the statewide implementation of the Election Code, voter registration process, and notaries public. She is sued in her official capacity only.

17.    Defendants Philadelphia County Board of Elections, Bucks County Board of Elections, and Allegheny County Board of Elections are responsible for conducting the pre-canvass and canvass of absentee and mail-in ballots in their respective counties, including comparing the declaration on the ballot envelope with the application to determine whether ballots will be counted.

18.    Defendant Rich Fitzgerald is the County Executive of Allegheny County and in that capacity serves as a member of the Allegheny County Board of Elections. He is sued in his official capacity only.

19.    Defendant Samuel DeMarco III is an at-large member of the Allegheny County Council and in that capacity serves as a member of the Allegheny County Board of Elections. He is sued in his official capacity only.

20.      Defendant Bethany Hallam is an at-large member of the Allegheny County Council and in that capacity serves as a member of the Allegheny County Board of Elections. She is sued in his official capacity only.

21.      Defendant Diane M. Ellis-Marseglia is the Chair of the Bucks County Board of Commissioners and in that capacity serves as a member of the Bucks County Board of Elections. She is sued in her official capacity only.

22.      Defendant Gene DiGirolamo is a member of the Bucks County Board of Commissioners and in that capacity serves as a member of the Bucks County Board of Elections. He is sued in his official capacity only.

23.      Defendant the Honorable Brian T. McGuffin is a judge on the Court of Common Pleas of Bucks County and in that capacity serves as a member of the Bucks County Board of Elections. He is sued in his official capacity only.

24.      Defendant Al Schmidt is a Philadelphia City Commissioner and in that capacity serves as a member of the Philadelphia County Board of Elections. He is sued in his official capacity only.

25.      Defendant Lisa M. Deeley is a Philadelphia City Commissioner and in that capacity serves as a member of the Philadelphia County Board of Elections. She is sued in her official capacity only.

26.      Defendant Omar Sabir is a Philadelphia City Commissioner and in that capacity serves as a member of the Philadelphia County Board of Elections. He is sued in his official capacity only.

## JURISDICTION AND VENUE

27.     Plaintiffs bring this action under 42 U.S.C. § 1983.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

28.     This Court has jurisdiction to grant both declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

29.     This Court has personal jurisdiction over the individual Defendants, who are sued in their official capacities, and the County Board of Elections Defendants. Secretary Boockvar and Director Mathis are statewide officials charged with implementing and enforcing Pennsylvania's Election Code across the entire Commonwealth, including in this District. Defendants Ellis-Marseglia, DiGirolamo, McGuffin, Schmidt, Deeley, and Sabir reside in and conduct their official duties in this District.

30.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### *Vote by Mail in Pennsylvania*

31.     In Pennsylvania, any qualified voter may request a mail-in ballot. 25 Pa. Stat. § 3150.12.

32.     To request a mail-in ballot, voters must provide their name, date of birth, length of time as a resident of voting district, voting district if known, party choice in case of primary, address to which they want their ballot sent, and signature (or witness statement if unable to sign). 25 Pa. Stat. § 3150.12 (b)-(d).

33.     The voter may also choose to be placed on the permanent by-mail voter list to receive mail-in ballots in all future elections without submitting any further request. 25 Pa. Stat.

§ 3150.12 (g). As a result, some mail-in voters' applications are intended only for the next election, while others are for all future elections.

34.      Upon receipt of the mail-in ballot application by the county board of elections, the board determines the eligibility of the applicant by verifying the proof of identification in the application with that on the applicant's permanent registration card. 25 Pa. Stat. § 3150.12b(a). If the board deems the applicant qualified, the application is marked "approved" and that voter will receive a ballot in the mail. *Id.* If not approved, the applicant will be notified immediately by the board along with the reason for not approving. 25 Pa. Stat. § 3150.12b(c).

35.      As soon as a ballot is certified and available, the county board of elections will mail or deliver mail-in ballots to approved mail-in ballot applicants. 25 Pa. Stat. § 3150.15.

36.      Voters then fill out and sign their ballots. 25 Pa. Stat. § 3150.16. Voters unable to sign may mark their ballot in the presence of a witness instead. *Id.* Ballots must be received by the county boards of elections by 8 PM on Election Day.

37.      Absentee and mail-in ballots may be pre-canvassed beginning at 7 AM on Election Day, with the canvass beginning after polls close on Election Day. 25 Pa. Stat. § 3146.8(g)(1.1); *id.* § 3146.8(g)(3). At the pre-canvass or canvass, county boards of elections are required to "examine the declaration on the envelope of each [mailed ballot] . . . and . . . compare the information" on the declaration with the voter's registration to "verify [the voter's] right to vote." 25 Pa. Stat. § 3146.8(g)(3). If the county boards of elections are "satisfied that the declaration is sufficient," *id.* § 3146.8(g)(3), and "the information contained in the 'Registered Absentee and Mail-In Voters File,'" the absentee voters' list and/or the 'Military Veterans and Emergency Civilians Absentee Voters File' verifies his right to vote," *id.*, the ballots "shall be counted and included with the returns of the applicable election district," *id.* § 3146.8(g)(4).

38.     Upon information and belief, in at least some counties, that verification process involves signature matching. During a July 23, 2020 public hearing held by the Senate State Government Committee, Jeff Greenburg, Director of Elections of the Mercer County Bureau of Elections, confirmed that some county boards of elections engaged in signature matching to verify ballots during the June 2020 primary election, and that ballots were rejected for signature-related issues.

39.     Despite the fact that Pennsylvania counties rely on signature-matching to verify ballots, the Pennsylvania Election Code does not establish a procedure for conducting signature match verification. Neither does it require the county election boards to provide voters with adequate notice or opportunity to cure if their ballot is rejected due to an inadequate or incomplete signature, nor does it preclude such a procedure. Yet Defendant Boockvar has not provided any guidance or instructions to county boards of elections to ensure a uniform statewide process for mail-in ballot verification or a notice and cure procedure.

40.     Upon information and belief, there is no consistent standard applied by Pennsylvania's county boards of election to verify mail ballots or notify voters of any potential deficiencies in their ballots.

41.     Upon information and belief, Pennsylvania does not require that officials of the State's 67 county boards of elections receive any training in signature or handwriting analysis, nor does it provide them with written standards or guidelines to aid in this assessment.

42.     As the Chief Elections Officer of Pennsylvania, Secretary Boockvar is the Chair of the Voting Standards Development Board. 25 Pa. Stat. § 204(c). The Voting Standards Development Board has the "power and duty to develop uniform and nondiscriminatory standards that define what constitutes a valid vote cast through a paper ballot and what constitutes a valid

vote through each type of electronic voting system used in the Commonwealth." 25 Pa. Stat. § 204(h)(1). Pursuant to that authority, Secretary Boockvar has the ability to issue guidance to County Boards of Election concerning the process to be followed if a mail-in or absentee ballot is rejected during the pre-canvass or canvass, including directing the Boards to provide voters whose ballots are rejected due to a perceived signature issue with notice of the rejection and an opportunity to cure the deficiency. Secretary Boockvar has not issued such guidance.

43.    County boards of elections are also authorized by the Election Code "[t]o make and issue such rules, regulations, and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers, and electors," as well as "to instruct election officers in their duties . . . and to inspect systematically and thoroughly the conduct of primaries and elections in the several election districts of the county to the end that primaries and elections may be honestly, efficiently, and uniformly conducted." 25 Pa. Stat. §§ 2642(f)-(g). Pursuant to that authority, County Boards of Elections may adopt a process that provides voters whose ballots are rejected due to a perceived signature issue with notice of the rejection and an opportunity to cure the deficiency. Upon information and belief, Defendant County Boards, and Defendants County Board members, have not adopted such a process.

*Pennsylvania's Signature Verification Procedure for Mail-In Ballots Is Unacceptably Error-Prone*

44.    Signature verification is an inherently flawed means of determining whether a mail-in ballot is fraudulent or unlawfully cast.

45.    No two signatures are exactly alike because of the many factors that affect the consistency of a person's signature from one signing (*i.e.*, the mail-in ballot application or voter registration) to another (*i.e.*, the mail-in ballot), including very variable factors such as type of pen, writing surface, stress, or other writing conditions.

12

46.     Signature variance is more common among certain populations of voters, including those with disabilities, those with less formal levels of education, elderly and young voters, and voters for whom English is a second language. Parkinsonism and other neurological disorders can also significantly affect handwriting characteristics, engender unfounded scrutiny over the authenticity of signatures, and impede accurate assessment of them.

47.     A study in Florida found that Black and Latino voters were more likely to have their ballots rejected. In 2016, 1.9% of Black voter ballots were rejected, 1.8% of Latino voter ballots were rejected, while only 0.7% of non-Latino white voter ballots were rejected.

48.     Even experienced forensic document examiners (FDEs) can find it difficult if not impossible to distinguish natural variations in a person's signature from fraudulent ones, especially where the reviewer has limited exemplars to compare.

49.     Laypersons, such as Pennsylvania election officials, have a significantly higher rate of error in determining whether signatures are genuine. Laypersons are also more likely to wrongly determine that authentic signatures are not genuine than to make the opposite error. In one study, laypeople incorrectly judged authentic signatures to be inauthentic more than 26% of the time.

50.     Thus, in every election, the untrained election officials responsible for signature verification under Pennsylvania's mail-in ballot verification system reject validly cast ballots because of erroneous judgments on signature matching issues.

51.     Also, because election officials undertake this task without standardized guidelines or procedures governing their analysis, they reject ballots based on arbitrary, variable criteria.

52.     Similarly, the *unintentional* omission of a voter's signature from their mail-in ballot usually reflects innocent user error rather than fraud or misconduct. Such an error could be easily resolved by providing the affected voter with notice of the problem and an opportunity to fix it,

yet Defendant Boockvar has provided no uniform statewide guidance or instructions requiring such a notice and cure procedure. Adoption of a process to provide voters with notice and an opportunity to cure signature-related deficiencies would not only ensure that eligible voters' validly-cast ballots are counted but would also discourage potential fraud or misconduct.

*Pennsylvania's Constitutionally Deficient Signature-Verification Process Denies the Right to Vote to Thousands of Voters*

53.     Prior to the passage of Act 77 in 2019, hundreds of voters who qualified to and did cast absentee ballots had their ballots rejected each election for benign signature-related deficiencies. For example, according to data compiled by the U.S. Election Assistance Commission, 460 absentee ballots were rejected in Philadelphia County in the November 2016 election because the envelope was missing a signature. Because Act 77 universalized the availability of mail-in voting in 2019, even more voters will likely have their ballots rejected for such benign reasons.

54.     According to news reports,[2] over 26,500 absentee and mail-in ballots were rejected in Pennsylvania in the June 2020 primary election, or 1.8% of the total absentee and mail-in ballots cast statewide.

55.     Upon information and belief, voters whose ballots were rejected in the June 2020 primary elections received no pre-rejection notice that their ballots were impaired by a signature defect, nor did they have any opportunity to cure the issue and have their vote counted. As a result, the State rejected valid ballots cast by many eligible Pennsylvania voters.

---

[2] *See, e.g.,* Caitlin Huey-Burns & Adam Brewster, *Why some mail-in ballots are rejected and how to make sure your vote counts*, CBS News (Aug. 4, 2020), https://www.cbsnews.com/news/why-mail-in-ballot-rejected-voting-counts/.

56.     There is no legitimate state interest advanced by Pennsylvania's unreliable signature verification procedures, or by its failure to provide notice and an opportunity to cure when a ballot is flagged for rejection because of an ostensible signature-related defect.

*Pennsylvania's Constitutionally Deficient Signature-Verification Process Will Affect a Growing Number of Voters*

57.     The number of Pennsylvanians who will vote by mail—and thus the number who will have their ballot rejected through Pennsylvania's signature verification process—is likely to increase significantly in upcoming elections, including the November 3, 2020 general election.

58.     In the June primary election, the first with universal mail-in voting, approximately 50% of Pennsylvanians voted by mail, with nearly 1.5 million voters casting either mail-in or absentee ballots.

59.     The ongoing COVID-19 pandemic is likely to further accelerate Pennsylvania's dramatic shift towards mail-in voting. The State, echoing the Centers for Disease Control and Prevention ("CDC"), recommends that to protect themselves from COVID-19, all citizens should "stay at home," as much as possible, "avoid public spaces," not attend "large gatherings" and "avoid using mass transit." Moreover, the CDC's first recommendation for election officials in the midst of this pandemic was to "[e]ncourage mail-in methods of voting."

## CLAIMS FOR RELIEF

## COUNT I

### 42 U.S.C. § 1983: Denial of Due Process Under the Fourteenth Amendment

60.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

15

61.     An individual has a liberty interest in the fundamental right to vote that is protected by the right to due process. Pennsylvanians also have a statutorily protected liberty interest in voting by mail.

62.     At a minimum, procedural due process requires that the State provide its absentee and mail-in voters with notice and a meaningful opportunity to be heard before being denied their protected liberty interest.

63.     The requirement for *pre-deprivation* notice is particularly important when deprivation will result in irreparable injury, as is the case with voting.

64.     Pennsylvania's failure to provide, on a uniform and statewide basis, absentee and mail-in voters with any opportunity to cure signature-related deficiencies with their absentee or mail-in ballot—particularly given the unreliability of signature matching and election officials' unfettered discretion to reject ballots—does not meet these minimum requirements of procedural due process and is thus unconstitutional.

65.     Such an opportunity to cure is particularly warranted here given the balance of implicated interests and harms. *See Mathews v. Eldridge,* 424 U.S. 319, 335 (1976). First, the interest at stake is of the upmost importance: the fundamental right to vote. Second, the risk of erroneous deprivation caused by the unreliability of signature matching and election officials' unfettered discretion to reject ballots is high; a notice and cure procedure would substantially reduce this risk. Finally, the implementation of procedures to provide absentee and mail-in voters with notice and an opportunity to cure would impose only a minimal burden on the State, which already maintains records during the ordinary course of business containing voter contact information, and already has infrastructure in place to carry out notice and cure requirements given

its existing legal obligation to inform mail-in voting applicants when their *application* is rejected because of a signature issue or their ballot risks rejection due to an identification issue.

66.      Absent the implementation of procedural safeguards, including notice and a meaningful opportunity to cure perceived signature-related deficiencies before a mail-in ballot is rejected, mail-in voters in Pennsylvania will continue to face a substantial risk of being deprived of their fundamental right to vote without due process.

67.      The State has no legitimate interest in permitting untrained local officials to reject voters' ballots based on an unreliable signature authentication process without providing voters any notice or opportunity to cure.

68.      Pennsylvania's current signature-verification procedure denies Pennsylvania voters procedural due process in violation of the Fourteenth Amendment.

## COUNT II

### 42 U.S.C. § 1983: Denial of the Fundamental Right to Vote in Violation of the First and Fourteenth Amendments

69.      Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

70.      "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). The Supreme Court has recognized that "voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184 (1979)).

71.      When analyzing the constitutionality of a restriction on voting, the Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put

forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Unreasonable, severe, or discriminatory burdens on the right to vote are subject to particularly close constitutional scrutiny.

72.    Defendants' unreliable signature-verification process rejects a significant number of validly cast ballots every election cycle as a result of benign discrepancies or technical errors. Defendants deny the individuals who cast these ballots the right to vote without any pre-deprivation notice or opportunity to verify their ballots. This system operates without uniform standards across counties and therefore puts voters' ballots at risk of rejection based on arbitrary, variable criteria. Such a system imposes a severe burden on voters' fundamental right to vote.

73.    The severity of this burden is exacerbated by voters' need during the COVID-19 pandemic to rely on mail-in ballots to effectively cast a ballot while safeguarding their health. Voters should not be required to risk their health or lives to cast a ballot they can be confident will count.

74.    As discussed above, each time a county board of elections—comprised of laypersons with no expertise in handwriting analysis—subjectively believes there is a mismatch between the signature accompanying the voter's mail-in ballot and the signature in the voter's file, that ballot is not counted, notwithstanding the many benign factors that can cause signature variation. And those factors place certain voters, like Plaintiff Gilligan, at heightened risk on the basis of their age, disability, national origin, race, or educational background without notice that their votes, once cast, could be rejected, or that they cannot be cured once their ballots are rejected.

18

75.     In contrast to the mail-in voting system, voters facing signature verification issues at their polling location are afforded the opportunity to verify their identity and cast a ballot. Pennsylvania law affords no similar opportunities to mail-in voters.

76.     Defendant can proffer no justification for this error-prone and procedurally deficient system that would outweigh the injury the rejection of thousands of ballots each election inflicts on the eligible voters who cast those ballots.

77.     Pennsylvania's current signature verification procedure unduly burdens the right to vote in violation of the First and Fourteenth Amendments.

## COUNT III

**42 U.S.C. § 1983: Denial of Equal Protection Under the Fourteenth Amendment**

78.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

79.     The Equal Protection Clause of the Fourteenth Amendment requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

80.     In the absence of any uniform statewide standards, Pennsylvania's unreliable and error-prone signature-verification procedures subject mail-in voters to arbitrary differences in the way signatures are analyzed and in whether and how voters are provided notice and an opportunity to cure signature problems, depending on the county in which they reside.

81.     Pennsylvania's reliance on the presence and matching of signatures to verify absentee and mail-in voters, without any standardized guidance, training, or procedures in place

19

to provide such voters with notice and an opportunity to cure signature-related ballot rejections, does not further any compelling or legitimate state interest sufficient to justify the unequal treatment of voters.

82.     Pennsylvania's current signature verification procedure violates the Equal Protection Clause of the Fourteenth Amendment.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court:

(a)     Issue a declaratory judgment that Pennsylvania existing signature verification procedures for mail-in voting unlawfully infringe the right to due process in violation of the Fourteenth Amendment to the Constitution of the United States;

(b)     Issue a declaratory judgment that Pennsylvania's existing signature verification procedures for mail-in voting unlawfully impose an undue burden on the right to vote in violation of the First and Fourteenth Amendments to the Constitution of the United States;

(c)     Issue a declaratory judgment that Pennsylvania's existing signature verification procedures for mail-in voting unlawfully infringe the guarantee of equal protection in violation of the Fourteenth Amendment to the Constitution of the United States;

(d)     Issue preliminary and permanent injunctions enjoining Defendants, their agents, employees, and successors, and all those persons acting in concert or participation with them from implementing signature verification procedures that lack uniform standards or uniform procedures for notification and opportunity to cure;

(e)     Preliminarily and permanently order Defendants to establish a procedure by which voters may cure deficiencies in their absentee or mail-in ballots, to include providing timely and reasonable notice of such deficiencies and a meaningful opportunity to cure, and to order

Defendants Boockvar and Mathis to provide guidance to all county election officials requiring implementation of that procedure;

(f)     Grant Plaintiffs' attorney's fees, costs, and litigation expenses pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12133; and

(g)     Grant other and further relief that the Court may determine to be necessary or proper.

August 7, 2020                                  Respectfully submitted,

Mark P. Gaber*                                  /s/ John P. Lavelle, Jr.
Danielle M. Lang*                               John P. Lavelle, Jr. (PA Bar# 54279)
Ravi Doshi*                                     Rachel Jaffe Mauceri (PA Bar# 209823)
Jonathan M. Diaz*                               MORGAN, LEWIS & BOCKIUS LLP
Caleb Jackson*                                  1701 Market St.
CAMPAIGN LEGAL CENTER                           Philadelphia, PA 19103
1101 14th St. NW, Ste. 400                      (215) 963-5000
Washington, DC 20005                            john.lavelle@morganlewis.com
(202) 736-2200                                  rachel.mauceri@morganlewis.com
mgaber@ccampaignlegal.org
dlang@campaignlegal.org
rdoshi@campaignlegal.org                        Susan Baker Manning*
jdiaz@campaignlegal.org                         MORGAN, LEWIS & BOCKIUS LLP
cjackson@campaignlegal.org                      1111 Pennsylvania Ave. NW
                                                Washington, DC 20004
                                                (202) 373-6172
*Application for Admission *Pro Hac Vice*       susan.manning@morganlewis.com
Forthcoming
                                                Corey R. Houmand*
                                                MORGAN, LEWIS & BOCKIUS LLP
                                                1400 Page Mill Road
                                                Palo Alto, CA 94304
                                                (650) 843-4000
                                                corey.houmand@morganlewis.com

                                                Chris Miller*
                                                MORGAN, LEWIS & BOCKIUS LLP
                                                101 Park Ave.
                                                New York, NY 10178
                                                (212) 309-6000
                                                chris.miller@morganlewis.com

*Counsel for Plaintiffs*